UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

STEVEN W. ROWLES,                    :
                                     :
          Plaintiff                  :    No. 4:08-CV-1006
                                     :
     vs.                             :    (Complaint Filed 5/22/08)
                                     :
MICHAEL J. ASTRUE,                   :
COMMISSIONER OF SOCIAL               :    (Judge Muir)
SECURITY,                            :
                                     :
          Defendant                  :

**ORDER**
October 22, 2008

THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:

          The above-captioned action is one seeking review of a
decision of the Commissioner of Social Security ("Commissioner")
denying Plaintiff Steven W. Rowles's claim for social security
disability insurance and supplemental security income benefits.
Disability insurance benefits (DIB) are paid to an individual if
that individual is disabled and is "insured," that is, the
individual has worked long enough and paid social security taxes.
Supplemental security income (SSI) is a federal income supplement
program funded by general tax revenues (not social security
taxes).  It is designed to help aged, blind and disabled
individuals, who have little or no income.

          In order to be eligible for disability insurance
benefits, an individual must be disabled and also insured.  The
last date that a claimant meets the requirements of being insured
is commonly referred to as the "date last insured." The parties

are in agreement that June 30, 2003, was the date that Rowles was last insured.  In order to establish entitlement to disability insurance benefits Rowles must establish a disability on or before that date.  42 U.S.C. § 423(a)(1)(A), ()(1)(B); 20 C.F.R. §404.131(a)(2008); see Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990).  Insured status is irrelevant in determining a claimant's eligibility for supplemental security income benefits.

Rowles, who was born on October 27, 1963, claims that he became disabled on June 19, 1999, as the result of a motor vehicle accident in which he sustained a neck fracture.  Rowles claimed that he re-injured his neck on August 1, 2000.  Tr. 191.[1]

The present action which involves a claim for both disability insurance benefits and supplemental security income benefits has a long and complicated procedural history.  We will now review that procedural history.

On February 12, 2001, Rowles filed an application for disability insurance benefits.  After his claim was denied initially, hearings were held on April 29, 2002, and September 12, 2002, before an administrative law judge.  On October 18, 2002, the administrative law judge issued a decision denying Rowles's application for disability insurance benefits.  Rowles filed a request for review of that decision with the Appeals Council of the Social Security Administration.  On January 21, 2004, the

_____

1.  References to "Tr.___" are to pages of the administrative record filed by the Defendant as part of his Answer on August 1, 2008.

Appeals Council vacated the administrative law judge's decision and remanded the case to the administrative law judge for further proceedings.  Tr. 100-103.  Supplemental hearings were held before an administrative law judge on June 3, 2004 and September 2, 2004. On November 10, 2004, the administrative law judge again denied Rowles's application for disability insurance benefits.   Rowles filed a request for review of that decision and on January 4, 2006, the Appeals Council found no reason to review the administrative law judge's decision.

Rowles then filed an action in this court.  <u>Rowles v. McMahon</u>, Civil No. 3:CV-06-0336 (M.D.Pa.)  The case was assigned to Judge Caputo and referred to Magistrate Judge Mannion for preliminary consideration.  On February 6, 2007, Magistrate Judge Mannion issued a report recommending that the case be remanded to the Commissioner to evaluate properly the medical evidence and Rowles's subjective complaints.  Specifically, Magistrate Judge Mannion recommended that the case be remanded for the administrative law judge to specify how, and which of, the medical evidence in the record does not support the treating physician's opinion.  The Magistrate Judge also recommended that the case be remanded for the administrative law judge to explain why he found the subjective complaints of Rowles relating to pain not fully credible.  No objections were filed to the report of Magistrate Judge Mannion and on March 8, 2007, Judge Caputo adopted the

report of Magistrate Judge Mannion in toto and remanded the case to the Commissioner for further proceedings.

This is where the procedural history becomes complicated.  After the administrative law judge on November 10, 2004, denied Rowles's application for disability insurance benefits, Rowles filed a new application, this time for supplemental security income benefits, alleging disability since June 19, 1999.  Tr. 639.  The application for SSI benefits was filed on December 10, 2004.[2]

Rowles's application for SSI benefits was denied initially on March 3, 2005, and Rowles then requested an administrative hearing.  A hearing was held before an administrative law judge on June 28, 2006.  After the hearing, the administrative law judge had Rowles examined by Mark P. Holencik, D.O.  The examination by Dr. Holencik occurred on August 16, 2006, and a report of that examination was submitted to the administrative law judge. Tr. 798.  The administrative law judge

---

2.  The application for SSI benefits has two conflicting dates for the alleged onset date of disability.  Rowles's application for SSI benefits is primarily typewritten and the typewritten onset date is November 10, 2004.  However, next to that date in handwriting is the date June 19, 1999. Tr. 639.  This discrepancy has no impact on the application for SSI benefits because SSI is a needs based program to which insured status does not apply and benefits may not be paid for any period which precedes the first month following the date on which an application is filed, or if later, the first month following the date all conditions for eligibility are met. See 20 C.F.R. §§ 416.203 and 416.501. Consequently, Rowles is not eligible for SSI benefits for any period prior to January 1, 2005.

reviewed that report and on January 10, 2007, issued a decision partially favorable to Rowles.  The administrative law judge found that Rowles had been disabled since August 16, 2006, but was not disabled before that date.  On January 22, 2007, Rowles requested that the Appeals Council review the portion of the administrative law judge's decision which found Rowles not disabled prior to August 16, 2006.

In accordance with Judge Caputo's remand order relating to Rowles's application for disability insurance benefits, the Appeals Council on April 20, 2007, vacated the Commissioner's decision relating to Rowles's disability insurance benefits claim. Furthermore, pursuant to 20 C.F.R. § 416.1484 the Appeals Council consolidated Rowles's DIB and SSI claims, of 2001 and 2004 respectively, and remanded them to the administrative law judge for further proceedings on the issue of disability prior to August 16, 2006.  The Appeals Council affirmed the administrative law judge's decision of January 10, 2007, to the extent that the administrative law judge found that Rowles was disabled beginning August 16, 2006, and entitled to SSI benefits from that date forward.

In accordance with the Appeals Council's order, a hearing was held before an administrative law judge on June 27, 2007, at which Rowles, a medical doctor, and a vocational expert testified.  Thereafter, on August 28, 2007, the administrative law judge issued a decision finding that Rowles had not proven that

his impairments prevented him from performing a range of unskilled sedentary work prior to August 16, 2006.  On September 6, 2007, Rowles requested that the Appeals Council review the administrative law judge's decision and on April 30, 2008, the Appeals Council found no basis to grant review.  Thus, the administrative law judge's decision of August 28, 2007, stood as the final decision of the Commissioner.

On May 22, 2008, Rowles filed a complaint in this court requesting that we reverse the decision of the Commissioner which denied him disability insurance and supplemental security income benefits for any time prior to August 16, 2006. The case was assigned to Judge Caputo but referred to Magistrate Judge Mannion for preliminary consideration. By order of September 12, 2008, the case was reassigned to the undersigned judge for disposition without reference to Magistrate Judge Mannion. The Commissioner filed an answer to the complaint and a copy of the administrative record on August 1, 2008.  Pursuant to Local Rules 83.40.4 and 83.40.5, Rowles filed his brief on September 9, 2008 and the Commissioner filed his brief on October 2, 2008.  The appeal became ripe for disposition on October 6, 2008, when Rowles in accordance with Local Rule 83.40.6 filed a reply brief.

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin.,  181

F.3d 429, 431 (3d Cir. 1999); <u>Krysztoforski v. Chater</u>, 55 F.3d 857, 858 (3d Cir. 1995).  However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence."  <u>Id.</u>; <u>Brown v. Bowen</u>, 845 F.2d 1211, 1213 (3d Cir. 1988); <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); <u>Fargnoli v. Massanari</u>, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); <u>Keefe v. Shalala</u>, 71 F.3d 1060, 1062 (2d Cir. 1995); <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001); <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

    Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988)(quoting <u>Consolidated Edison Co. v. N.L.R.B.</u>, 305 U.S. 197, 229 (1938)); <u>Johnson v. Commissioner of Social Security</u>, 529 F.3d 198, 200 (3d Cir. 2008);  <u>Hartranft v. Apfel</u>, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more

than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213.  In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence.  Mason, 994 F.2d at 1064.  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707.  Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income claims. See 20 C.F.R. §404.1520 and 20 C.F.R. § 416.920; Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) engaged in substantial gainful activity after the onset of the alleged disability, (2) has a severe impairment, (3) has an impairment that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.  <u>See</u> Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). The residual functional capacity assessment must include a discussion of the individual's abilities.  <u>Id</u>; 20 C.F.R. § 404.1545; <u>Hartranft</u>, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

In this case the administrative law judge at step one found that Rowles had not engaged in substantial gainful activity since June 17, 1999.[3]  Specifically, the administrative law judge found that Rowles's earnings after June 17, 1999, did not rise to the level of substantial gainful activity.

At step two, the administrative law judge found that Rowles suffered from the following severe impairments: cervical spondylosis following a cervical fracture, myofascial pain syndrome, substance abuse, a deformed finger on his right hand, status-post closed head injury from a June 1999 motor vehicle accident, and as of November 2004 lumbar disc disease with lumbar radiculitis.

---

3.  It is unclear why the administrative law judge used the date June 17, 1999, because the motor vehicle accident occurred on June 19, 1999. That accident occurred when Rowles was riding home with a friend from work.  Tr. 798.

At step three, the administrative law judge found that Rowles's severe impairments did not individually or in combination meet or equal a listed impairment.

At step four, the administrative law judge found that Rowles did not have the residual functional capacity to perform his past work as a forklift operator, roofer and laborer repairing skids but that Rowles prior to August 16, 2006, had the residual functional capacity to perform the exertional demands of unskilled sedentary work with the limitation that he had to be allowed to alternate between sitting and standing and could not be required to lift more than ten pounds occasionally and had to "limit repetitive upper extremity motion of his non-dominant right upper extremity."  Tr. 577-578.

Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  20 C.F.R. §§ 404.1567(a), 416.967(a).  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Id.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.  Id.

The administrative law judge noted that if a claimant can perform the full range of sedentary work, a finding of "not disabled" would be directed by Medical-Vocational Rule 201.25.

The administrative law judge, however, concluded that Rowles's
ability to perform the full range of sedentary work was "impeded
by additional limitations."  Those limitations were that Rowles
had to be allowed to alternate between sitting and standing and
could not be required to lift more than ten pounds occasionally
and had to "limit repetitive upper extremity motion of his non-
dominant right upper extremity."  Tr. 577-578.

          In light of these additional limitations, the
administrative law judge took testimony from a vocational expert
to determine whether or not jobs existed in the national economy
for an individual of Rowles's age, education, work experience and
residual functional capacity.  The vocational expert testified
that prior to August 16, 2006, Rowles had the residual functional
capacity to perform a limited range of sedentary work.
Specifically, he stated that Rowles could not perform his past
work, but prior to August 16, 2006, could perform the unskilled,
sedentary jobs of restricted security guard, surveillance systems
monitor and semiconductor bonder and that there were significant
numbers of such jobs in the national and local economies. The
administrative law judge concluded that based on Rowles's residual
functional capacity he was not disabled prior to August 16, 2006,
because he could perform the jobs identified by the vocational
expert.

          At this point we will review Rowles's employment history
and medical evidence relevant to Rowles's claim for disability

insurance and supplemental security income benefits. As noted earlier in order to be entitled to disability insurance benefits, Rowles must prove that he was disabled prior to June 30, 2003. Also, as stated in footnote 2 Rowles is not eligible for supplemental security income benefits for any period prior to January 1, 2005.

We will also review the gaps in the administrative record where there is no evidence of contact with medical providers or medical treatment.

After the June 19, 1999, motor vehicle accident Rowles was treated at Lewistown Hospital and the Geisinger Medical Center.  The medical record of the treatment received at Geisinger Medical Center entitled "Emergency Medicine Note" prepared by Steven Zlotowski, M.D., states in part as follows:

> This is a 35-year old gentleman who was apparently the unrestrained passenger in a motor vehicle with rollover who was initially evaluated at Lewistown Hospital.  The patient denies any loss of consciousness and apparently self-extricated himself through the windshield and then climbed up the embankment and flagged down help.  A trauma workup was pursued at Lewistown Hospital, although I only have partial records from that facility.  They did send over a CT scan[4] of his neck which does reveal a right C2 lateral fracture. No other plain films or CT films accompanied his transfer to our facility.  He did have an alcohol of 223 at 1634 hours in the afternoon . . . He arrived at our facility alert, awake and oriented although somewhat

---

4.  A CT scan is a computed tomography scan, also referred to as a CAT scan or computed axial tomography scan.  The CT scan generates a three dimensional image of the inside of an object from a large series of two-dimensional X-ray images taken around a single axis of rotation.

combative and abusive at times but does generally
cooperate with the medical exam. . . .

PHYSICAL EXAMINATION: . . . He has no evidence of scalp
or other [head, eye, ear, nose and throat] trauma.  He
has negative signs for basilar skull fracture.  He has
no tenderness to palpation over his infraorbital region,
maxillary or mandibular region.  He has no apparent
intraoral trauma. . . he is mildly tender along the
upper portion of the cervical spine. . . Neurologically
he is moving all four extremities and denies any
numbness or tingling in his extremities.

EMERGENCY DEPARTMENT COURSE: . . . The patient had
plain films of his C-spine, chest, thoracic and lumbar
spine, and pelvis.  These films do not reveal any
obvious pathology, although his supine chest X ray is
unable to clear his mediastinum, and we are not able to
get full visualization of his C-spine on the lateral
view.  Again, he does have the C-spine from another
facility where a CT scan was performed and we are able
between the CT scan and the [anterior-posterior] and
odontoid views at our facility of plain films to fully
evaluate his neck. Additionally he had CT scans
performed of his head, chest, abdomen, and cuts through
his thoracic and lumbar spine notably T6 as there was
some question of possible compression fracture on his
plain films of his thoracic spine.  These CT scans were
all negative . . . cuts through T6 do not reveal any
evidence of fracture that may have been suggested on the
plain thoracic films. . . .

IMPRESSION: Status post [motor vehicle accident] with
apparent isolated right C2 lateral mass fracture . . .
I suspect that he may very well be discharged with a
Miami J collar and appropriate orthopaedic followup
for his neck fracture. . . .

Tr. 215-216.

The administrative record reveals evaluations at

Geisinger Medical Center of radiographs (x-rays) of the thoracic

and cervical spine dated June 20 and 28 and July 12 and 28, 1999.

The June 20, 1999, medical record which relates to the thoracic

spine states in pertinent part as follows:

14

>A single lateral view centered over the mid- and upper
thoracic spine was taken in the swimmer's projection.
The vertebral bodies are not optimally visualized, but
I can see no gross malalignment of the upper thoracic
vertebral bodies and nothing to suggest gross fracture.

Tr. 213.  The June 28, 1999, medical record which relates to the

cervical spine states in pertinent part as follows:

>Attention is centered on the upper cervical spine, The
lower cervical spine is not clear on these views.  No
abnormalities of disk space or alignment of the
visualized cervical vertebrae can be seen.  The
prevertebral soft tissue structures and posterior
elements appear to be intact.  No reliable radiographic
evidence of a C2 fracture is seen, and not much change
has occurred since 6/19/99.

>IMPRESSION: No reliable radiographic abnormalities of
the cervical spine are identified.

Tr. 212.   The July 12, 1999, medical record which relates to the

anterior-posterior and lateral views of the cervical spine states

in pertinent part as follows:

>The two views show no change in the appearance of the
cervical spine since June 28, 1999.
The open mouth view shows a slightly asymmetrical
appearance of the right lateral mass of C2 when
compared to the left without change in the interval.

Tr. 210.   The July 28, 1999, medical record which also relates to

the anterior-posterior and lateral views of the cervical spine

states in pertinent part as follows:

>The study includes an open-mouth view as well as a
lateral projection.  Only the upper six cervical
vertebrae are visible on the lateral view.  The
odontoid and the articulation between C1 and C2 are
well visualized on the open-mouth projection.  I
see no change in the alignment of the cervical
vertabrae bodies when compared with the prior study
of 7/12/99.  Apparently, the patient had a fracture

15

of the lateral mass of C2 on a CT scan previously.
This is not visible on the current study.

Tr.  207.[5]

At the time of the accident Rowles was employed "off and on" and had previously worked as a roofer and forklift operator. Tr. 171, 178, and 546,  After the accident, Rowles was employed as a laborer from May 22, 2000, to July 29, 2000, for Treen Pallets, Thompsontown, Pennsylvania, repairing skids.   Tr. 168, 169, 191, and 233.  In a work history report submitted by Rowles to the Social Security Administration, Rowles stated with respect to his employment at Treen Pallets that he lifted and carried skids "all day long" and he worked nine hours per day, 5 days per week.  Tr. 169.  In the year 2000, Rowles's total income was $2830.45.  Tr. 140 and 146.

After the treatment and evaluations of radiographs at Geisinger Medical Center, the administrative record gives no indication that Rowles had contact with medical providers until August 1, 2000, when he reported to the emergency room of the Lewistown Hospital with back and neck pain and right arm numbness. Tr. 234.  The medical record of that visit to the emergency room states in pertinent part as follows:

---

5.  Rowles did visit the emergency room at Lewistown Hospital on July 10, 1999, complaining of headaches and pain.  Tr. 244-245. He was discharged and referred to Geisinger Medical Center.  Tr. 243.  Lewistown Hospital had a telephone follow-up with Rowles on July 15, 1999.  A report of that telephone call states that Rowles "saw MD at Danville is doing ok."  Tr. 247.

`             This is a 36-year-old gentleman who back on June 19
             was in a motor vehicle accident and states that he
             suffered back and neck fracture.  The patient was sent
             to Geisinger where he was treated.  The patient states
             that he was discharged. [Then today while] he was at
             home he was just lying and all the sudden he developed
             a popping sound on the right side of his neck with some
             numbness in his right arm going only to the elbow. Did
             not extend on down to the wrist.  Patient came here
             concerned about this pain and this numbness.  Patient
             denied any new trauma.  No other medical problems.

             *     *     *     *     *     *     *     *     *     *     *

             PHYSICAL EXAMINATION: . . .

             NECK: Supple.  Patient has collar on with no signs of
             any trauma to palpation of the neck. . . .

             EXTREMITIES: Upper extremities have full range of
             motion, 5/5 motor strength . . . .

             DIAGNOSTIC IMPRESSION: Neck pain, possibly due to old
             injury.

             PLAN: Plan here will be do a CAT scan and rule out any
             bleed from the complaint of headache. . . . CT was read
             as negative. . . . Case was discussed with Dr. Sole at
             Geisinger Hospital and they will accept patient in
             Emergency Room for further evaluation.  Most likely he
             will not be admitted. . . . Patient is stable.

Tr. 234-235.  A CT or CAT scan was performed of Rowles's brain at

Lewistown Hospital Imaging Services.  That scan was normal.  Tr.

237.  There was no evidence of intercranial hemorrhage. Tr. 237.

Also, a radiograph of the lateral cervical spine was taken and a

report prepared which states that "[t]he lateral cervical spine

shows unremarkable appearance to the cervical spine to the level

of C6. C7 is not well seen on this evaluation.  The evaluation of

the prevertebral soft tissues are unremarkable."  Tr. 238.

17

On August 2, 2000, Rowles was evaluated at the emergency room of the Geisinger Medical Center. The "Emergency Medicine Note" of that visit states in relevant part as follows:

> The patient is a 36-year old male status post C-2 right lateral mass fracture after a motor vehicle accident approximately one year ago. The fracture was treated with immobilization by a collar by Dr. James Widmaier. The fracture apparently healed well. The patient present today after he was bending over at home and heard and felt a pop on the right side of his neck which immediately precipitated loss of feeling and motor function from the neck down. The patient states that he fell over onto the floor and was unable to move for approximately two minutes. After that period of time feeling as well as motor control returned slowly. The patient presented to the Emergency Department via ambulance and upon arrival is complaining of headache, right-sided neck pain, and tingling pins and needles in the right arm and hand.
>
> *     *     *     *     *     *     *     *     *     *     *
>
> PHYSICAL EXAMINATION: . . . The patient . . . arrive[d] in the Emergency Department in a cervical collar in no acute distress. . . . Neck: Right-sided paraspinal tenderness. No midline tenderness or abnormality. . .
>
> Extremities: Within normal limits. Strength in the upper extremities is 5/5 and equal. Strength in the lower extremities is 5/5 and equal. . . . .
>
> EMERGENCY DEPARTMENT COURSE: The patient arrived in the Emergency Department in a cervical collar via ambulance. X rays of the cervical spine were obtained . . . and determined to be consistent with previous X rays obtained after the patient's accident. The patient continued to complain of headache as well as neck pain and was therefore given one dose of morphine 5 mg subcutaneously. The cervical collar was removed, and the patient's neck was palpated. There was no midline tenderness over the cervical spine. The patient was then asked to flex, extend and rotate his neck and was able to perform these maneuvers without pain. Based on x-ray evidence plus the clinical picture it was determined that there was no acute skeletal injury in the patient's neck. It was

18

decided that he could be discharged . . . .

Tr. 205-206.

The report of a radiograph taken at Geisinger Medical

Center on August 2, 2000, states as follows:

> Open mouth, [anterior-posterior], swimmers, and
> cross-table lateral projections are compared to the
> prior study of 7/28/99.  Apparently the patient had
> a prior history of fracture involving the C2 vertebral
> body.
>
> On the current study the odontoid is very slightly
> eccentrically located between the lateral masses of
> C1, oriented more toward the right side.  There may
> be very slight anterior slippage of C2 with respect
> to C3.  Both of these changes were present on the
> prior examination.  The patient also has some
> degenerative change involving the lower cervical
> spine.  I see no other abnormality of the cervical
> spine and no acute abnormality.

Tr. 204.   A report of a radiograph of the anterior-posterior and

lateral views of the cervical spine taken at Geisinger Medical

Center on October 2, 2000, states in pertinent part as follows:

> Anterior-posterior and lateral views obtained at 15:30
> hours show no apparent change in the alignment of the
> cervical spine when compared to the prior study of
> 8/2/00.  Apparently, the patient had a documented
> injury of the lateral mass of C2 on CT scan some time
> ago.  The alignment of the spine in this area appears
> unremarkable and the vertebral bodies appear well
> aligned on the views available.  There are some
> degenerative changes of the lower cervical spine,
> primarily consisting of marginal spurring.
>
> Lateral flexion and extension views show that there
> appears to be limited flexion and extension, but no
> significant change in the alignment of the vertebral
> bodies, particularly at the C1-2 level.

Tr. 202.

19

Rowles next paid a visit to the emergency room of the Lewistown Hospital on August 24, 2000, for treatment of a laceration of the right forearm and right hand.  The medical report of that visit states in pertinent part as follows:

> This is a 36-year-old male who fell while digging out some pine trees.  He fell onto some broken glass and lacerated the volar aspect of his right forearm and several puncture wounds of the third, fourth, and fifth digits of the right hand. He is left handed.

Tr. 229.

Rowles social security records reveal that he was employed in 1981, 1983 through 1995, 1997, 1998 and 2000.  Of those years his best year with respect to income was 1998 when he earned $24,346.53 and his worst year was 1990 when he earned $175.00.  No earning were reported for 1982 and 1996.   Although Rowles testified he was working on June 19, 1999, prior to the accident, no earning are reported for that year.   Rowles told the administrative law judge that for several years, he was a self-employed subcontractor making "very good money" . . . "under the table."  Tr. 500, 913-914 and 923.  On or about May 4, 2001, Rowles told Karen A. Steidle, M.D., who acted as an independent medical consultant for the administrative law judge, that he interviewed for multiple jobs after 1999 but was not hired.  Tr. 269.

Rowles did roofing, operated a forklift, repaired skids and did general construction work.  Such work is described as medium to heavy work. The Social Security Administration

20

regulations describe medium work as "involv[ing] lifting no more
than 50 pounds at a time with frequent lifting or carrying objects
weighing up to 25 pounds." 20 C.F.R. § 404.1567©.  Heavy work is
described as "involv[ing] lifting no more than 100 pounds at a
time with frequent lifting or carrying of objects weighing up to
50 pounds."  20 C.F.R. § 404.1567(d).

    Within 12 months of the motor vehicle accident Rowles
was employed by Treen Pallets repairing skids.  As noted earlier
Rowles stated on a document filed with the Social Security
Administration that his work for Treen Pallets involved carrying
skids "all day long" and working nine hours per day, 5 days per
week.  Tr. 169.  It is clear that Rowles engaged in medium to
heavy exertional work after his June 19, 1999, motor vehicle
accident.

    From the end of July, 1999, until August 1, 2000, there
is no indication in the administrative record that Rowles
contacted or received treatment from any medical providers or
complained about his cervical neck injury.  In fact as already
stated Rowles engaged in medium to heavy exertional work from May
through July, 2000.

    As stated above in August 2000, Rowles walked into the
emergency room at the Lewistown Hospital complaining of back and
neck pain with right arm numbness.  Tr. 233-34.  Testing of his
head and cervical spine were negative.  Tr. 204, 236-38.  A
physical examination revealed full range of motion and strength in

21

all extremities, no cervical spine tenderness and that he was able to flex, extend, and rotate his neck "without pain." Tr. 205-206 and 234. It was determined that there was no acute skeletal injury. He was discharged and subsequently x-rays were taken which showed that the alignment of the spine in the area of the reported C-2 fracture appeared "unremarkable" with well-aligned vertebral bodies. Tr. 202 and 206. At the end of August 2000 he returned to the Lewistown Hospital emergency room with lacerations of his right forearm and hand. The medical record of that visit states the he indicated he fell onto broken glass "while digging out some pine trees." When questioned about this work activity at a subsequent hearing before an administrative law judge, Rowles stated that he was just an "innocent bystander" standing around. Tr. 502-503.

The next contact with medical providers occurred on February 24, 2001, when Rowles underwent a magnetic resonance imaging (MRI) of his cervical spine. The final report of the MRI states in toto as follows;

> MRI CERVICAL SPINE: The examination is correlated with a prior CT of the cervical spine dated 6-19-99. Images are acquired in the sagittal and axial planes using T1, as well as FAST spin echo T2 and gradient echo sequences. Signal characteristics of the vertebral bodies appear generally unremarkable. There is mild disc desiccation throughout the entire cervical region. Signal characteristics of the cervical cord appear unremarkable. Transaxial images were acquired from C2-T1. These show no evidence for disc herniation or spinal stenosis. The study is considered negative for acute bony pathology. Neural foramina are patent at all levels.

IMPRESSION: NEGATIVE STUDY OF THE CERVICAL SPINE.
Tr. 225.

On March 29, 2001, Jonathan Costa, M.D., evaluated
Rowles for the first time at the Hershey Medical Center.
Inconsistent with all diagnostic studies and with the 1999 medical
records of Rowles's visit to the emergency room at Geisinger
Medical Center which stated that Rowles had "no loss of
consciousness" but climbed up a bank after extricating himself
through the windshield of the motor vehicle, Dr. Costa diagnosed a
possible fracture with multiple derangements and probable post-
concussive syndrome.  Dr. Costa's support for his diagnoses was
based only on Rowles's reduced range of motion in the cervical
region, muscle tightness and Rowles's subjective complaints,
including complaints of neck pain.[6]  At the March 29th examination

---

6.  The medical record relating to Dr. Costa's exam of Rowles on
March 29, 2001, states in pertinent part as follows:

> The patient smells strongly of cigarettes, and he was
> somewhat hyperexcitable.  He does not turn his head or
> neck past the midline to the right, and only rotates
> about 1/4 to the left.  There is no right lateral
> bending, and 1/4 active range of motion to the left.
> Sensation to light tou[c]h is intact in both upper and
> lower extremities.  Strength in lower extremities is
> symmetrical 5-/5 throughout.  Strength in upper
> extremities is symmetrical, and 4+, it is marked tremor
> bilaterally with isometric excursion and give away.
> There are multiple healed scars on the right hand.
> Pectoralis, periscapulur and paraspinals are very
> tight bilaterally, right more than left.

(continued...)

Rowles told Dr. Costa that he was advised against physical therapy after the motor vehicle accident.  However, Dr. Costa recommended physical therapy two to three times per week for six to eight weeks with a good to fair rehabilitation potential.  Tr. 264-265 and 285-287.

On April 4, 2001, Dr. Costa completed an employment assessment form for the Pennsylvania Department of Public Welfare in which he stated that Rowles was temporarily disabled from June 1999 to March 29, 2002, because of a "closed head injury" and "cervical strain/sprain."  Tr. 267. No objective medical evidence supported such a broad claim.  Furthermore, there is no evidence that Dr. Costa was treating Rowles during 1999 or 2000.

On April 9, 2001, Rowles was evaluated by Lynda Powell, a physical therapist.  A report of that evaluation was prepared and submitted to Dr. Costa.  Tr. 262.  Of particular note for Rowles's claim of disability is a statement by the physical therapist that upper extremity strength and range of motion is within normal limits.  She did note that he had significant loss of cervical range of motion.  Tr. 262.  She further noted that he would benefit from more frequent physical therapy. Tr. 263. At the appointment with Ms. Powell, Rowles rated his pain 7 or 8 on a scale of 1 to 10.  Tr. 262.

---

6.  (...continued)
Tr. 264.

In April 2001, Dr. Costa prescribed stronger pain medication after Rowles repeatedly telephoned complaining of recurrent headaches with no relief.  Tr. 261.  Rowles also asked to stop physical therapy.  Tr. 261.  After examining Rowles on April 27, 2001,  Dr. Costa stopped physical therapy questioning whether Rowles had some "volitional component" interfering with his rehabilitation.  With respect to the April 27th appointment, Dr. Costa's treatment note merely states with respect to the physical examination that Rowles "still holds his head relatively immobile."  Tr. 261. Dr. Costa sent Rowles to a pain management specialist and noted that Rowles should "remain off work."  Tr. 261.

On May 14, 2001, Christopher Stowe, M.D., a pain management specialist, evaluated Rowles at the Pain Medicine and Palliative Care Center of The Milton S. Hershey Medical Center. Tr. 280-281. Dr. Stowe noted that Rowles was involved in ongoing litigation regarding the June 19, 1999, motor vehicle accident. Tr. 280. At the hearing before the administrative law judge in 2007, Rowles testified that he received a $9000.00 settlement. Dr. Stowe noted in his report of the examination that Rowles's

> [m]usculoskeletal exam reveals decreased range of motion in all planes for the neck.  Palpation of the neck reveals some myofascial trigger points and tenderness on the right trapezial and paraspinal areas.  He also has tenderness over the right paraspinal facet joint region.  He has extremely limited range of motion of the neck to active and passive range.

Tr. 281.  Dr. Stowe stated that he would perform cervical facet joint injections on the next visit and would also consider trigger point injections at a future date.  Tr. 280.  Subsequently, on July 2, 2001, Rowles underwent cervical facet joint injections on the right side at three levels (C3, C4 and C5).  Tr. 277.  The report of the procedure notes that Rowles "had immediate pain relief[.]" Tr. 277. Also, under the physical examination section of the report it is stated that Rowles was "alert and oriented x 3 with [] tender cervical facet joints at C3-4, C4-5 levels much more on the right than the left.  Neurological examination was nonfocal and intact." Tr. 277.  The assessment of the physician was cervical facet arthopathy. Tr. 277.  Prior to the treatment Rowles rated his pain 8 on a scale of 1 to 10.  Tr. 277.

On August 3, 2001, Rowles visited the Pain Medicine Center.  During that visit Rowles stated that the injections of July 2nd provided him with "some relief lasting for three weeks." Tr. 322.  Rowles rated his pain during that visit as a 6 on scale of 1 to 10 and denied having weakness or numbness of the upper extremities.  Tr. 322.  The report of the visit notes that Rowles was in the process of applying for disability benefits.  The physical examination portion of the report of that visit states that "[t]he patient has decreased range of motion in the cervical spine.  Neurologically, he is intact." Tr. 322.  The physician's impression was that Rowles was suffering from "[s]tatus post whiplash injury" and "[c]ervical facet arthopathy."  Tr. 322. The

26

physician "continue[d] [Rowles] on his current regimen" and "gave
him prescriptions for Vicodin . . . to be taken on an as needed
basis." Tr. 322.

Rowles was next seen at the Pain Medicine Center on
September 12, 2001, and underwent radiofrequency neuroablation of
the median branch nerves in the cervical spine.  The report of
that visit states in relevant part as follows:

> [Rowles] has been seen previously, first on July 2,
> 2001, and then on August 3, 2001, and underwent
> cervical facet nerve blocks on the right side at
> C3, C4, and C5.  He had a favorable response with
> decreased range of motion, and for this reason was
> scheduled today to undergo a more lasting procedure
> consisting of a radiofrequency neuroablation of the
> median branch nerves in the cervical spine.
> Today he reports his pain level is 7/10 and once
> again located predominantly in the right posterior
> neck area extending into the occipital scar area.
> He denies paresthesias, bowel or bladder changes, or
> weakness.
>
> PHYSICAL EXAMINATION:... The patient appears alert
> and oriented, in no acute distress.  Head revealed
> tenderness extending into the right paraspinal neck
> area with pain and guarding.  There was decreased
> range of motion.  No Spurning sign was noted.
> Neurologically examination revealed no sensory or
> motor deficits.  Gait was normal, non-antalgic, no
> limping.  Spine revealed no evidence of straight
> leg raising . . .
>
> ASSESSMENT:
> 1. Chronic neck pain.
> 2. Cervical spine facet arthropathy.
> 3. History of whiplash injury.
>
> *     *     *     *     *     *     *     *     *     *     *
>
> [After the procedure Rowles] was . . . able to sit up
> and reported no adverse problems.  His vital signs
> remained stable throughout the procedure.  He was then
> discharged after a period of observation with a

designated driver.  He is to return to the clinic in
approximately 4 weeks for further evaluation and
intervention.

Tr. 318-319.

On October 17, 2001, Rowles was again seen at the Pain
Medicine Center.  The report of that visit states in pertinent
part as follows:

On presentation today, the patient suggests that he
received minimal relief status post-radiofrequency
ablation that lasted only about one week.  He continues
to have ongoing neck pain with reduced range of motion.
. . . the patient continues to have constant dull pain
in the neck which is a 6 out of 10 on the visual analog
scale.  The patient has occasional paresthesia in the
right C6-7 distribution.  The patient has had increased
stiffness over the past few weeks.

Current medication include Vicodin . . . The patient
takes 4-5 per day with significant relief. . . . The
patient has been started on Valium 2 mg which provides
the patient with significant relief at night time. . .
Physical Examination: . . . Upper extremities reveal
motor strength of 5/5 bilaterally.  Sensation is intact.
 . . . Head and neck exam: Reduced range of motion in
all directions secondary to pain.  Significant spine
muscle spasm. . . .

Assessment:

1. Cervical spondylosis, status post C2 cervical
fracture.
2. Cervical facet arthopathy.
3. Myofascial pain, status post whiplash injury.
4. Possible cervical radiculopathy.

Tr. 316-317.

Physical examinations by various specialists revealed
normal motor strength and intact sensation in his upper
extremities.  Tr. 277, 312, 317-318, 322.  Contemporaneous with

28

Dr. Costa's management of Rowles's treatment, Rowles was examined in 2001 by Karen Steidle, M.D., who noted that Rowles pesented with no studies for review, but if his reports of a cervical fracture were true, his symptoms would have a different distribution. Tr. 268-71.  Dr. Steidle stated that there was no clear-cut radiculopathy on examination and found that Rowles could perform sedentary work activity.  Tr. 272-73.

Although Dr. Costa continued to note that Rowles should remain "off work," and completed several disability questionnaires provided by Rowles's attorney, he also continued to insist on a functional capacity evaluation to determine Rowles's true disability status as his physical examinations provided minimal objective findings.  Tr. 276, 279, 288-97, 333, 344, 352, 405-11, 421-22, 418-19, 425.

In August 2001, Dr. Costa wrote only one word in the physical examination section of his treatment note.  That word was, "noncontributory" Tr. 276; he also noted that Rowles's MRI was "totally negative." Tr. 344.  In 2002 Dr. Costa wrote only, "[t]he patient appears to have had increased head movement compared to previously and appears to have gained weight.  He is hoarse."  Tr. 333.  In 2003 Dr. Costa noted that Rowles's more recent cervical MRI was good even though Rowles was awaiting his disability determination. Tr. 418.  In 2003, Dr. Costa also noted that Rowles saw Dr. Sheehan, a surgeon, who informed Dr. Costa that Rowles's studies showed no evidence for acute injury as there

was nothing out of alignment; Dr. Sheehan could not explain Rowles's pain based on the imaging studies.  Tr. 418 and 477. In 2004 Dr. Costa completed Rowles's disability questionnaire even though he noted that he had not seen Rowles since review of his MRI. Tr. 425 and 465.

Dr. Costa also continued to note Rowles's "narcotic seeking behavior" and, by April 2002, noted that Rowles would have to get his medications from Dr. Taylor, his primary care physician.  Tr. 333.  When Rowles returned in 2003 requesting more medication and insisting that he was taking nothing but Aleve, Dr. Costa refused to prescribe anything.  Tr. 418-19.

In 2002, Rowles sought treatment when he was to be incarcerated for a parole violation. Tr. 304 and 388. His neck was supple with good range of motion, and he moved all his extremities with equal range of motion.  Tr. 305 and 387-88.  Diagnostic studies were negative.  Tr. 388 and 392.  The attending physician noted that Rowles smelled strongly of alcohol and declined to prescribe any narcotic drugs.  Tr. 387-388.

In 2004, Rowles had several appointments with  Michael J. Murray, M.D.  On January 20, 2004 he visited Dr. Murray complaining of joint pain and joint stiffness in the lower, middle and upper back.  Tr. 735.  Rowles requested that Dr. Murray prescribe him Vicodin.  Dr. Murray's report of that visit states that Rowles "[w]alks with a smooth, even and well-balanced gait." Tr. 735.  Dr. Murray's assessment of Rowles was Osteoarthrosis

30

Generalized Multiple Sites and Hypertension Unspecified.  Tr. 235.
The report of the visit indicates that Rowles was prescribed
several medications, including Vicodin for pain and Atenolol for
hypertension.

Rowles again visited Dr. Murray on April 13, 2004,
requesting Vicodin. Tr. 733.  Dr. Rowles's assessment was
basically the same.  Dr. Murray did note that the Osteoarthrosis
was chronic, stable and the severity mild.  He also noted that
Rowles's hypertension was chronic, moderate in severity and
stable.  Tr. 734.  Dr. Murray did not prescribe any new
medications.

On June 14, 2004, Rowles visited Dr. Murray complaining
of pain.  During that visit he told Dr. Murray he needed a
statement that "he can't work." Tr. 732.   The report of the
visit does not indicate that Dr. Murray conducted a physical
examination (other than taking blood pressure, pulse and
respiration readings and having him weighed and his height
measured) or make an assessment of Rowles's condition.  There was
no change made in Rowles's prescriptions.  Tr. 732.

On September 2, 2004, Rowles again visited Dr. Murray
complaining of pain and requesting that he be prescribed Vicodin.
Dr. Murray conducted a physical examination and noted that Rowles
"[w]alks with a smooth, even and well-balanced gait" and that
neurologically Rowles was "[a]lert and oriented x3."  He further
stated that Rowles "[d]isplay[ed] comfort and cooperation during

31

the encounter", an observation which is noted by Dr. Murray in practically all of his reports of Rowles's appointments.  Tr. 730. In addition to the prior assessment of hypertension and osteoarthrosis, Dr. Murray had a new assessment of "Disc Disorder Other & Unspec Cervical Region." Tr. 730.  Also, it appears that additional medications were prescribed for Rowles's hypertension.

On October 21, 2004, Rowles had an appointment with Dr. Murray.  A physical exam revealed that Rowles's neck was symmetric, supple and limited in range of motion.  Dr. Murray's assessment was hypertension, osteoarthrosis generalized multiple sites, and intervertebral disc displacement lumbar [without] myelopathy.  Dr. Murray ordered an x-ray and MRI of Rowles's spine and an electromyograph (EMG) of the lower extremity.  Tr. 722.[7]

On November 5, 2004, Rowles had an appointment with Dr. Murray at which time Rowles requested Vicodin for pain.  The report of that visit prepared by Dr. Murray states that Rowles failed to get the EMG but that the procedure was rescheduled for November 19th.  Dr. Murray reviewed the results of the MRI noting that the lumbar spine shows no radiculopathy, no significant spinal stenosis, mild L5-S1 arthritis and "Lt neuroforaminal stenosis." Tr. 718. The report of the MRI from the Lewistown Hospital Imaging Services Department states as follows: "There is

---

7.  An electromyograph detects the electrical potential generated by muscle cells. It is used to diagnose two general categories of disease: neuropathies and myopathies.

no spinal stenosis or radiculopathy at any level. There is
degenerative change at the L5/S1 disc with disc bulge and moderate
narrowing of the left L5/S1 neural foramen." Tr. 720.
Dr. Murray's assessment of Rowles on November 5, 2004, was
spondylosis unspecified site without myelopathy.

       An EMG was conducted on November 19, 2004.  Tr. 710.
The report of the EMG states in pertinent part as follows:

       This is an abnormal study.

       It is supportive of diagnosis of L5 radiculopathy in
       the left lower extremity. . . .

       There is no evidence of peripheral neuropathy or
       myopathy in the left lower extremity.

Tr. 710.

       On November 22, 2004, Rowles had an appointment with Dr.
Murray.  Tr. 716.  During that appointment Rowles complained of
severe back pain.  Dr. Murray report of that visit states that the
MRI "showed Lt paracentric disc herniation" although the actual
report of the MRI refers to "degenerative change at the L5/S1 disc
with disc bulge." Tr. 716, 720.  Dr. Murray in his report of the
November 22nd appointment further noted that the EMG showed chronic
left L5 radiculopathy.  Dr. Murray assessed Rowles as having
intervertebral lumbar disc disorder with myelopathy.  Tr. 716.
Dr. Murray referred Rowles to Jyotish Grover, M.D., a pain
management specialist.  Subsequently, Dr. Grover informed Dr.
Murray that she was unable to contact Rowles.

33

The administrative record reveals no evidence that Rowles had any other contact with medical providers until August of 2005, when a "Multiple Impairment Questionnaire" was completed by Everett Hills, M.D.  Tr. 16-23.   Dr. Hills examined Rowles on August 23, 2005.  Dr. Hills noted in the questionnaire that he had never seen Rowles prior to August 23, 2005.   Dr. Hill's diagnosis of Rowles was that Rowles had "neck pain with x-ray evidence of spondylosis."   He further noted that Rowles "demonstrates reduced range of motion on physical examination of the neck." Tr. 16.   In Dr. Hills's opinion, Rowles's symptoms apear[ed] to be magnified relative to the physical impairments."  Tr. 17.  Although Dr. Hills declined to give an opinion regarding "malingering" by Rowles, Dr. Hills noted that Rowles's desire to get disability benefits affected his impairments.  Tr. 21.  Rowles also was seen by Craig Richmand, M.D.,  a psychiatrist in August and October of 2005.  Tr. 827-828.

After the three contacts with medical providers in August and October, 2005, there is no evidence in the administrative record indicating that Rowles had any contact with medical personnel until August 16, 2006, when he was examined by Mark Holencik, M.D., who issued a report which states in relevant part as follows:

> Clinically the patient is alert and oriented and quite straight forward (sic) in a rough-hewn sort of way.  He is 6 feet tall and weighs 210 pounds. He is left hand dominant.
> He has a rather wide based shuffling gait of

chronic myelopathy.  He has difficulty removing
his shoes.  He is able to flex in a level stance
phase but with his feet wide apart for balance,
bringing his fingertips to only about the knees
before diffuse thoracolumbar and basilar pain
intervenes.  He can extend only to neutral.
There is virtually no side bending or rotation.
He has marked focal thoracolumbar spasm and also
periscapular and posterior cervical pain to
palpation and severe spasm.
He has marked patellar hyper-flexia at about
6/4+ and 3-4 beat unsustained ankle clonus.  He
has about 7-8 cm of left leg atrophy measured at
the greatest circumference of the leg and unless
this is a "new" finding I am surprised that this
has not been mentioned by other examiners.  He has
a stork-like leg on the left with robust muscle
development of the right leg and calf.  His quite
hyperactive patellar reflexes have not been mentioned
either and when I tapped his patellar reflex seated on
the edge of an exam table his entire body shudders.
. . .  He demonstrates virtually no cervical rotation
to the right and only about 10-15 degrees to the left.
He has no cervical extension possible and about 30
degrees of flexion possible.  He has a very irritable
neck with marked cervical paraspinal spasm. . . .
He . . . has tremulous upper extremities at 2-3 cycles
per minute right worse than left. He has diminished
right power grip activity.   . . .
The man is myelopathic and clumsy.  He clearly has
cervical spinal cord damage.  He has a neck that cannot
move in any direction and constant suboccipital
muscular headaches.  He has an EMG positive left
radiculopathy with marked leg atrophy that correlates
clinically with his positive EMG.  He has marked
thoracolumbar spasm.  He has a clumsy wide based gait
that is myelopathic. . . .  I can see no employment
possibility for this man and I believe it would be
difficult to rehabilitate him from a vocational
standpoint.

Tr. 798-803.

We will now address the primary argument raised by

Rowles in his appeal brief filed with us.

The administrative law judge in his decision of August 28, 2007, assigned limited weight to Dr. Costa's opinion that Rowles was disabled and could not work prior to August 16, 2006. Tr. 581. One of the reasons that the case was remanded to the Commissioner by Judge Caputo was to have the Commissioner explain why Dr. Costa's opinion was given very limited weight. Rowles presently argues that the administrative law judge failed to give appropriate weight to the opinion of Dr. Costa that Rowles was disabled. We find no merit in this argument.[8]

The administrative law judge in his decision explains in detail his consideration and treatment of Dr. Costa's opinion and why he accorded Dr. Costa's opinion limited weight.  Tr. 574-584. Of particular importance is the following portion of the administrative law judge's decision which outlines Rowles's contact with Dr. Costa, Rowles's poor response to physical therapy and his use of narcotics, Rowles's lack of credibility, and the administrative law judge's consideration of the testimony of E. Chillag, the medical doctor who testified at the administrative hearing:

8.  Rowles also argues that the administrative law judge "fail[ed] to keep the promise he made to Plaintiff at the hearing" to "grant Plaintiff a closed year of disability for the year following his accident."  We find this argument devoid of merit.  The transcript of the administrative hearing reveals that the administrative law judge stated that "I [cannot] say what I'm going to find right now . . . I'm giving the benefit of the doubt on the fracture". . ."I'm going through this with a fine-tooth comb . . . to highlight all the findings I think are important; and then, I'm going to weigh the decision."  Tr. 91,914, 916.

Dr. Chillag testified that given the nature of the claimant's impairments and treatment received, he could reasonably be considered to be disabled for six months after the injury occurred and that maybe this disability could be extended for one year.  He testified that the claimant was not disabled for any other period other than the time following his initial injuries as noted above.  In looking at the records immediately following the accident, which are from Geisinger and Lewistown Hospital, [Rowles] was actively treated for about six weeks following the accident and the next evidence is from August 2000, or 14 months after his alleged onset date, when he went to the emergency room with concerns about his neck popping.  Emergency room physicians noted at that time that his fracture had healed well and after appropriate tests were done, he was discharged.  He then sought care in earnest in early 2001.  Given the short amount of treatment following his accident and then no evidence of care for several months plus a notation that his fracture healed well, I do not find the record supports a one year period of disability following his alleged onset of disability.  A six month period of disability is feasible.

Dr. Chillag further testified a cervical spine fracture should not affect an individual's ability to stand and walk after the six month recovery period ended.  He noted it could cause the range of motion loss [Rowles] reported and that it could reasonably be contributing to [Rowles's] headaches.  He further noted findings in the record which reflected [Rowles's] lower extremities were intact such as he had a steady gait and normal reflexes.  He did note that in 2006 that [Rowles] had a shuffling gait and I note parenthetically that this would be after the development of documented lumbar disc disease.

One of [Rowles's] treating sources who has supported disability for [Rowles][] is Dr. Costa, a physical medicine and rehabilitation specialist.  Due to his specialty and the treatment relationship, I carefully examined all of Dr. Costa's reports.  One thing I noted is that the bulk of Dr. Costa's care occurred between March 29, 2001 and April 15, 2002.  After April 15, 2002, it appears that Dr. Costa only saw the claimant three more times, namely in April 2003, October 2003, and July 2004.  At least 2 of these visits occurred when [Rowles] brought in paperwork for Dr. Costa to complete

in support of his disability claim.  It is also
significant in Dr. Costa's records that by April 27,
2001, he noted that [Rowles] had a poor response to
physical therapy and there may have been some volitional
component present.  In the latter reports, he expressed
concern about [Rowles's] narcotic seeking behavior. . .
Of note is Dr. Costa's treatment record of April 11,
2002 where he notes that [Rowles] should continue his
medication with Dr. Taylor, who was his primary care
physician.  Dr. Costa advised he would no longer be
following [Rowles] although [Rowles] could return to
the clinic on an as needed basis.  He noted in October
2003 that [Rowles] requested narcotics but he told
[Rowles] he was not going to provide [Rowles] with
narcotics because of the issue of multiple providers.
Upon hearing this, [Rowles] told Dr. Costa that he
had not taken any narcotic medicines for the last
60 days . . . .

There are some significant credibility concerns
present, two of them being [Rowles's] narcotic
seeking behavior and his minimizing of his alcohol
abuse issues. [Rowles], upon questioning, usually
indicated he only drinks a little, he has not
drunk recently, and the like.  However, there
are multiple occasions when he was inebriated at
Lewistown Hospital.  His narcotics seeking behavior
has been discussed above.  Another credibility concern,
although minor in isolation, are the injuries sustained
when he allegedly observed a tree being pulled out
of the ground.  Although he alleges he was an observer,
his story seemed a bit unusual and it not necessarily
believable, especially in light of his less than honest
statements regarding alcohol abuse.  Also, the hospital
emergency room records suggest he was digging out the
pine tree, not that he was a passive observer.  Another
credibility concern is his lack of follow-up with
recommended treatment. . . . Given these credibility
concerns, I did not accept all [of Rowles's] allegations
at face value as his candor has been somewhat
questionable over the last several years.

Dr. Costa suggested on multiple occasions that [Rowles]
get a functional capacity evaluation . . . ., a
recommendation that he never followed through on or
if he did, this evidence was never submitted to me.
. . .

As for the opinion evidence, I assign limited weight

to Dr. Costa's opinions that [Rowles] is disabled and
can not work.  Although I assign great weight to the
aspect of his opinions that suggest the claimant is
rather limited from a work standpoint, [Rowles] has
indicated at times he can lift up to ten pounds or
even 20 pounds at one time. . . . Prior to November
2004, Dr. Costa's opinions regarding [Rowles's] ability
to stand and walk are poorly supported and inconsistent
with Dr. Chillag's opinions that [Rowles's] neck
problems should not have any significant impact on his
ability to stand and walk.  I also considered that
although Dr. Costa regularly treated [Rowles] for a
one year period, his care after that time was sporadic.
As such, given that [Rowles] is seeking seven years of
disability, there is only a relatively short period
of time when Dr. Costa had an ongoing and regular
treatment relationship with [Rowles]. Also, it is
unknown whether Dr. Costa had access to the Lewistown
hospital records or records from [Rowles's] family
doctor. . .  Dr. Costa indicated that [Rowles] could
only sit for one hour or less in an eight hour workday
yet [Rowles] spent a large amount of his day sitting
in a chair, albeit a comfortable chair.  As such, Dr.
Costa's opinion that he can only sit for 1 hour or less
in an 8-hour workday is inconsistent with [Rowles's]
own activities.  Dr. Costa reported [Rowles] was
essentially precluded from using his upper extremities.
His report suggests [Rowles] is only capable of
spending most of his day with his arms at his side,
and that he would be essentially incapable of handling
a task as simple as taking a soda out of the
refrigerator and opening it, using his remote control,
and turning lights on and off. [Rowles] is not this
limited. Accordingly, I assign limited weight to Dr.
Costa's opinions.  Although I recognize that [Rowles]
is limited in his work capacities, Dr. Costa's opinions
go beyond the realm of reasonableness as to how far
[Rowles] is limited.

Tr.  579-581.  This portion of the administrative law judge's

decision clearly reveals that the administrative law judge fully

and appropriately  evaluated Dr. Costa's opinion and the

credibility of Rowles.

The administrative law judge stated with respect to Dr. Hills that he placed very little weight on Dr. Hills's opinion that Rowles was disabled because Dr. Hills only met with Rowles once. Tr. 582.  He also stated that Dr. Hill's opinions were not adequately documented.  Tr. 582. Dr. Hills did not conduct or order any new diagnostic or laboratory studies or tests. Tr. 17. Dr. Hill noted possible symptom magnification and that an emotional factor affecting Rowles was anxiety and Rowles's "desire to get disability benefits." Tr.16-23,  582.

As for Dr. Murray, the administrative law judge stated as follows:

> I also considered that Dr. Murray also submitted a statement that [Rowles] was disabled.  This was prepared at [Rowles's] request.  This report is inconsistent with aspects of Dr. Murray's treatment records, particularly his reports prior to November 2004, which noted the claimant walked with a smooth, even, and well-balanced gait, and he had mild arthritis. Although Dr. Murray's reports following November 2004 note additional problems in the claimant's lumbar spine, these problems were addressed by incorporating a sit/stand restriction into the residual functional capacity.

Tr. 582.[9]

We find no error in the administrative law judge's treatment of the opinions of Drs. Costa, Murray and Hills.

---

9.  We discern no evidence in the administrative record that Dr. Murray had contact with Rowles after the November 22, 2004, appointment.  We conclude that the administrative law judge's reference to "reports of additional problems in claimant's lumbar spine" relates to the November 22, 2004, treatment notes where Dr. Murray changed his assessment to intervertebral lumbar disc disorder with myelopathy. Tr. 716.

The social security regulations specify that the opinion of a treating physician may be accorded controlling weight only when it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case. 20 C.F.R. § 404.1527(d)(2); SSR 96-2p.  An impairment, whether physical or mental, must be established by "medical evidence consisting of signs, symptoms, and laboratory findings," and not just by the claimant's subjective statements.  20 C.F.R. § 404.1508 (2007).  Dr. Costa's opinion of disability, during the relevant time period, was not only unsupported by the diagnostic studies performed, but also inconsistent with other evidence.  The administrative law judge correctly accepted Dr. Costa's opinion that Rowles was limited from a work standpoint but was not required to except Dr. Costa's opinion that Rowles was totally disabled.

Although the administrative law judge found that Rowles could not return to his past work as a roofer, forklift operator and laborer repairing skids, the administrative law judge reasonably found that Rowles prior to August 16, 2006 had the capacity for a range of sedentary work.  To some August 16, 2006, may appear to be an arbitrary date.  However, there is no medical evidence in the record prior to that date establishing disability.  As noted previously from the end of 2004 until August 16, 2006, the administrative record reveals only three contacts by Rowles

41

(two in August 2005 and one in October 2005) with medical
providers.  Two of the contacts were with a psychiatrist.

It was the evaluation of Dr. Holencik which resulted in
the administrative law judge concluding that Rowles was disabled
as of the date of the evaluation.  In light of the fact that the
burden was on Rowles to establish disability and the fact that
from late November, 2004, to August 16, 2006, there is very little
medical evidence in the administrative record, we cannot fault the
administrative law judge for awarding supplemental security income
benefits from August 16, 2006, forward.[10]

The administrative law judge recognized that Rowles
suffered from severe impairments.  However, the administrative law
judge accommodated Rowles's's exertional limitations.  The
administrative law judge determined that Rowles was limited to the
exertional demands of sedentary work with additional limitations
as noted earlier in this order.  According to the vocational
expert, Rowles prior to August 16, 2006, could perform several

10.  We were troubled by the fact that Dr. Holencik stated that
Rowles's left "leg atrophy . . . correlates clinically with his
postive EMG."  The EMG was ordered and reviewed by Dr. Murray in
November, 2004.  The EMG was abnormal and showed L5
radiculopathy. Dr. Holencik observed "a clumsy wide based gait
that is myelopathic."  Dr. Holencik's statement would suggest
that Rowles's disabling conditions, including the lower left leg
muscle atrophy and the clumsy myelopathic wide-based gait,
observed on August 16, 2006, had their impetus in the L5
radiculopathy diagnosed in November, 2004.  However, there is no
indication in the medical records that Dr. Murray or  Dr. Hills
and Dr. Craig Richman, the psychiatrist, who saw Rowles in August
and October 2005, noticed any such conditions.

42

unskilled sedentary jobs which existed in significant numbers in the local and national economies.

Based on the medical evidence set forth in the administrative records, including the statements of Rowles to his treating physicians, we cannot conclude that the administrative law judge erred in finding Rowles's testimony regarding his pain prior to August 16, 2006, not entirely credible.

Our review of the administrative record reveals that the decision of the administrative law judge is supported by substantial evidence. We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the decision of the Commissioner of Social Security denying Rowles social security disability insurance benefits and supplemental security income benefits from June 19, 1999, through August 15, 2006.  The medical evidence does not support a finding that Rowles was disabled prior to August 16, 2006.

NOW, THEREFORE, IT IS ORDERED THAT:

1.   The Clerk of Court shall enter judgment in favor of the Commissioner and against Rowles as set forth in the following paragraph.

2.   The decision of the Commissioner of Social Security denying Steven W. Rowles social security disability insurance benefits and supplement security income for any period  prior to August 16, 2006, is affirmed.  The decision awarding Rowles supplemental security income benefits from August 16, 2006, forward is affirmed.

43

3.   The Clerk of Court shall close this case.


s/Malcolm Muir
MUIR
United States District Judge


MM:gs